IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 14-cv-00093-RPM

INGRID IVERSEN, Individually and as
Personal Representative of the Estate of Terry Tyler,

       Plaintiff,
vs.

AGA SERVICE COMPANY,

       Defendant.

---

ORDER GRANTING SUMMARY JUDGMENT OF DISMISSAL

---

Dr. Terry Tyler lived with his wife, Ingrid Iversen, near Durango, Colorado. On December 29, 2012, they went to San Miguel de Allende, State of Guanajuato, Mexico. Before going, they purchased a Travel Protection Policy issued by Allianz Global Assistance.

Dr. Tyler died in the Hospital de la Fe in San Miguel de Allende in the afternoon of January 3, 2013.

Ms. Iverson as Personal Representative of her husband's estate brought this civil action against the producer and administrator of the Policy, AGA Service Company ("AGA" or "the defendant"), under the Colorado Wrongful Death Statute, C.R.S. §13-21-202, claiming that Dr. Tyler would not have died if the Defendant had performed its contractual obligation to provide timely emergency medical transportation to the closest appropriate facility in the United States where he would have received adequate treatment to preserve his life.

Ms. Iversen must show that Dr. Tyler would have lived if the Defendant had performed its contractual duty to provide emergency medical transportation.

The emergency medical transportation benefits of the Policy provide in pertinent part:

**EMERGENCY MEDICAL TRANSPORTATION**

Important

If your emergency is immediate and life threatening, seek local emergency care at once....

You or your representative must contact us and we must make all transportation arrangements in advance. We will not pay for any of the services listed in this section if we didn't authorize and arrange it.

*Moving you to a hospital or medical clinic (emergency medical evacuation)*
If you're seriously ill or injured during your trip and our medical team determines that the local medical facilities are unable to provide appropriate medical treatment:
- our medical team will consult with the local doctor;
- we'll identify the closest appropriate facility, make arrangements and pay to transport you to that facility;
- we'll arrange and pay for a medical escort if we determine one is necessary.

(Def.'s Ex. G at AGA000763 (emphasis removed).)[1]

The Defendant has moved for summary judgment of dismissal contending that after full discovery the Plaintiff has not produced enough admissible evidence to support a finding by a reasonable jury that Dr. Tyler would have lived if a medical evacuation to an appropriate care facility had happened after the Defendant's obligation to transfer the patient had been invoked.

---

[1] Unless otherwise stated, references to exhibits are to exhibits submitted in support or in opposition to the defendant's motion for summary judgment. The parties also submitted exhibits with the briefing of the defendant's motions to exclude the testimony of plaintiff's expert witnesses. There is a significant amount of duplication.

The obstacle that the Plaintiff is unable to overcome is that the cause of Dr. Tyler's death cannot be determined within a reasonable degree of medical probability because there is not enough information to provide a basis for a determination by competent evaluators.

Dr. Tyler's health history is complex and his condition before this travel was extremely fragile. He was a 72 year old retired psychiatrist. In January 2012, Dr. Tyler described his own health history in a statement given to his personal physician in these words.

> Since October 25th I've had a stroke, two or three episodes of kidney failure and emergency dialysis, carotid jugular fistula 2" dialysis catheter, attempted angiographic repair without success, several episodes of changes of consciousness, usually as part of the kidney failure, but at least once from accidental narcotic OD, one or two (I think two) episodes of bronchitis, two episodes of serious medication reactions (deafness, tendonitis which was painful for 6 weeks), a kidney transplant, low back and/or hip pain to the point of being unable to walk, a fractured femur and surgery to pin the parts of the femur together, a fever, necessitating, because of the immune-suppressants, a host of antibiotics, days and days in the hospital, needing inpatient and outpatient rehab for the fracture, cataract surgeries (not a big deal), ... I had a severe "stress reaction for two weeks to this which I later decided was an acute Addison's crisis. Will see endocrinologist soon. Scheduled for total left shoulder replacement 1/23/2011 [sic]. told would get anatomical replacement, but since last eval have had significant loss of deltoid functioning.

(Def.'s Ex. I at AGA-PA-000171-72; *see also* Def.'s Ex. J, Sigurslid Dep. at 23:19-24:6.) A few months later in April and May of 2012, he had hospital admissions for fever and pneumonia. (Def.'s Ex. C, Wiseman Dep. at 29:5-16.) In July, August, September, October, and November of 2012, he was hospitalized several times and underwent surgeries for gastro-intestinal issues. (*Id*.; Def.'s Ex. A, Iversen Dep. at 152:13 – 162:19; Def.'s Ex. K, Saddler Dep. at 69:1-17.)

After arriving in Mexico on December 29, 2012, Dr. Tyler began to feel unwell and complained of stomach pain. On December 30, 2012, he stopped eating and may have stopped drinking. (Def.'s Ex. A, Iversen Dep. at 184:22 – 185:18.) In the middle of the night of

December 30 or early morning of December 31, 2012, Dr. Tyler became incoherent. (*Id*. at 185:19 – 186:3.) With the assistance of a friend, Ms. Iversen took Dr. Tyler to the Hospital de la Fe, where he was admitted at approximately 7:30 a.m. on December 31, 2012. (*Id*. at 191:6 – 192:3.)

The court record includes very little information about Dr. Tyler's medical condition and treatment at the Hospital de la Fe. The doctor most involved with Dr. Tyler's treatment there was Dr. Arturo Barrera Bortoni ("Dr. Barrera"). Neither party deposed Dr. Barrera or any other member of the hospital staff.[2]

The only contemporaneous records of what occurred while Dr. Tyler was in the Hospital de la Fe are (a) 4 pages of records from Hospital de la Fe, which AGA obtained through Letters Rogatory (*see* doc. #34-3 at pp. 31-35); (b) AGA's employees' notes about their communications with Dr. Barrera (Def.'s Ex. E), and (c) the American and Mexican versions of Dr. Tyler's death certificate (Defs.' Exs. F and L).

Other information about Dr. Tyler's illness, condition, and treatment while in Mexico comes from Ms. Iversen's recollection and involvement, two emails from Dr. Barrera, and an account Dr. Barrera provided to Mexican legal officials in the course of responding to the Letters Rogatory. (*See* Def.'s mot. for summ. j. at p. 6, n. 4; Def.'s mot. to exclude testimony of Loren G. Lipson, at p. 4.)

---

[2]In briefs, the parties referred to Dr. Arturo Barrera Bortoni as "Dr. Barrera." Dr. Loren G. Lipson's expert report refers to Dr. Arturo Barrera Bortoni as "Dr. Bortoni."

The facts of the response to the request for medical evacuation are documented in AGA's case notes, which describe the time and content of its employees' communications with Ms. Iversen, Dr. Barrera and others. (Def.'s Ex. E.)

There are some disputes about the chronology. To the extent those disputes are material, they are resolved in the Plaintiff's favor for the purpose of determining the Defendant's motion for summary judgment.

Ms. Iversen testified that she stayed with Dr. Tyler at the Hospital de la Fe during the day on December 31, 2012, then spent that night at a private residence where she and Dr. Tyler were staying. When she returned to the hospital the next morning (January 1, 2013), Dr. Tyler was feeling better. She said he had regained coherency and was talking and walking. (Def.'s Ex. A, Iversen Dep. at 197:15-22; 200:21 – 201:10.) Dr. Tyler remained in the hospital on January 1, 2013. Ms. Iversen stayed with him during the daytime and returned to the house that evening to sleep. (*Id.* at 203:20 – 204: 2.)

On the morning of January 2, 2013, Ms. Iversen returned to the hospital and learned that Dr. Tyler's condition had deteriorated. Dr. Barrera told her that Hospital de la Fe was not equipped to care for Dr. Tyler's medical needs and advised her that she should arrange to have Dr. Tyler evacuated to the United States. (*Id.* at 204:3-9.)

Ms. Iversen then called a friend in Colorado (Nora Hallock) and asked her to contact AGA. (*Id.* at 208:20 – 209:4.)

Ms. Hallock called AGA and spoke with Carmen Letusick ("Letusick"). That was AGA's first notification about Dr. Tyler's hospitalization and request for emergency medical transportation. There is a factual dispute about whether that telephone call occurred at

approximately 12:15 p.m. Eastern standard time (as the Plaintiff contends) or at approximately 2:15 p.m. (as the Defendant contends).[3]

It is undisputed that when AGA was first notified of Dr. Tyler's medical emergency, he had been at the Hospital de la Fe for more than two days.

In that initial phone call, Ms. Hallock said she was calling on behalf of Dr. Tyler and Ms. Iversen to request emergency medical transportation for Dr. Tyler under his travel insurance policy because Dr. Tyler had taken ill and might be suffering from kidney failure. Hallock provided Letusick with Hallock's name and phone number; Dr. Tyler's name; the Policy number; the date of Dr. Tyler's admission; the name and telephone number of the Hospital de la Fe; Dr. Barrera's name and cell phone number; Ms. Iversen's name and two telephone numbers for Ms. Iversen, and that Dr. Tyler was insured through Medicare. (Pl.'s Ex. 4, Letusick Dep. at 9:18 – 17:25 & Dep. Ex. 19; Def.'s Ex. E at AG00045-50.)

In addition to that information, AGA needed passport information, written authorizations and more specific information about Dr. Tyler's medical insurance. (Def.'s Ex. O, Deyo Dep. at 22:24 – 24:17.) To obtain authorizations and insurance information, AGA uses a written form, known as an "AAMED form." (*See* Def.'s Ex. B, Deyo Aff. ¶ 12.)

---

[3]AGA's employees were located in Virginia, in the Eastern time zone. San Miguel de Allende is located in the central time zone, a one hour time difference. In the Defendant's briefs, chronological references are to Eastern Standard time, and that practice has been continued in this order.

To support her contention that Hallock called Letusick at 12:16 p.m., the Plaintiff refers to an internal AGA email sent by Letusick regarding Hallock's phone call. (*See* Letusick Dep. Ex. 19 attached to Pl.'s Ex. 4, doc. #77-4.) That email indicates it was sent at 12:16 p.m. Relying on other documentary evidence, the Defendant contends that Hallock first called AGA at approximately 2:15 p.m. (*See* Def.'s Ex. E.) The Defendant explains the 12:16 p.m. time designation on Letusick's email as a "time-zone printing error." (*See* Def's mot. for summ. j. at p. 8, n.5.)

There is a factual dispute about when AGA sent the AAMED form to Ms. Iversen. The Defendant states that on January 2, 2012, at 2:40 p.m., it sent the AAMED form via fax to the Hospital de la Fe. (*Id.*; see also Def.'s Ex. E.) It is unclear whether the hospital gave the form to Ms. Iversen. She contends that she did not receive it until approximately10:00 p.m., when AGA sent another form by email.

AGA's case notes show that Hallock called AGA again at approximately 3:36 p.m. and spoke with AGA case manager Gary Stephens. AGA's case notes regarding that conversation state that Hallock reported she had spoken with Ms. Iversen, and Ms. Iversen was concerned that Dr. Tyler was "fading fast" and the problem could be "neuro and not kidney ...." (Def.'s Ex. E at AGA00052.)

AGA's case notes indicate that Stephens spoke with Ms. Iversen at approximately 3:40 p.m., and Ms. Iversen stated the "doctor just left and says need to move [Dr. Tyler] quickly." (Def.'s Ex. E at AGA00052.) Stephens advised her that AGA needed to speak with the treating doctor. They also discussed the need for a completed AAMED form. (*Id.*)

At approximately 4 p.m., AGA employee Karen Garbett ("Garbett"), a registered nurse, spoke by telephone with Dr. Barrera. (Def.'s Ex. E at AGA00051; Def.'s Ex. M, Garbett Dep. at 32:10-33:22.) AGA's notes of that conversation read as follows:

> Rn conf w/CM Gary and TMO DR Arturo Barerra
> DX: Stroke-Right sided - clot on the left temporal lobe - seen in hospital 10 hours after the stroke, PMH of kidney transplant and also HTN.
> VSS
> S/S: Presented with nausea and vomiting and diarrhea, dehydration and Right sided paralysis – now in renal failure, not urinating
> LABS: Creatnine 4.5 and not making urine, Potassium and other electrolytes normal
> DX studies: CT was done x2 - stroke in temporal lobe
> IV fluids, IV Antibiotics, Diuretics, and HTN medication Lisinopril as per home

-7-

> Sub cannot walk, is able to swallow some liquids, cannot eat food, TMO states
> that sub is alert and oriented, but cannot move at all on the Right side.
> They do not feel comfortable taking care of patient neurologically and are
> concerned about renal status. The TMO thinks patient should return to the USA
> via AA with a nurse and respiratory therapist as the hospital is not able to care for
> the patient. Also post kidney transplant and kidney is not working now.

(Def.'s Ex. E at AGA00051-52.) Garbett testified that Dr. Barrera informed her that Dr. Tyler had suffered a stroke with a "clot on the left temporal lobe," and that he had "[r]ight side paralysis" with the additional issue of "renal failure." (Def.'s Ex. M, Garbett Dep. at 32:10-33:22.)

Based on that information, AGA's on-call medical director, Dr. Scott Syverud, determined that a medical evacuation to the United States was necessary. (Def.'s Ex. Q, Syverud Dep. at 51:19-52:5); *see also* Def.'s Ex. B, Deyo Aff. ¶¶ 16, 31; Def.'s Ex. E at AGA00051.) Dr. Syverud believed that evacuation was necessary to save Dr. Tyler's life and recommended emergency evacuation for Dr. Tyler as soon as possible. (Pl.'s Ex. 10, Syverud Dep. at 48:1 – 5. 56:5 – 57:5.)

It is undisputed that when AGA consulted with Dr. Barrera (at approximately 4 p.m., Eastern time), Dr. Tyler could not have been transported via commercial airline due to his medical condition.

AGA decided that Dr. Tyler should be evacuated by air ambulance to a hospital in south Florida.

The process of providing an international medical evacuation by air ambulance involves making arrangements with an air ambulance provider, obtaining a receiving facility in the United States, filing of fight plans, dealing with customs in both countries, and arranging ground transportation on both ends. (*See* Def.'s Ex. Q, Syverud Dep. at 18:24-19:22.)

At around 4:36 p.m., Teresa Faber, a member of AGA's emergency medical transport team, began contacting various air ambulance companies, requesting quotes for their services of transporting Dr. Tyler to south Florida and finding a bed at a receiving hospital. (Def.'s Ex. S, Faber Aff. ¶ 4.)

Faber states in an affidavit that "it became apparent from the responses that only a daytime or twilight transport was possible." (Def.'s Ex. S, Faber Aff. ¶ 4.) Faber says that one air ambulance company responded that it would not operate in that area at night due to security concerns" and another one stated that the "airport closed at midnight." (*Id.*)

There is a factual dispute about whether an air evacuation for Dr. Tyler could have occurred before the daylight hours of January 3, 2013. The Plaintiff disputes Faber's testimony about the airport's operating hours, asserting that commercial flights arrive and depart from the Guanajuato International Airport at night. The Plaintiff also disputes that security concerns were a valid reason for delay. (*See* Pl.'s Ex. 12, Kuykendall report dated August 14, 2015.)

AGA chose Latitude AeroMedical Works ("Latitude") to do the transportation and locate a receiving hospital. (Def.'s Ex. B, Deyo Aff. ¶ 33; Def.'s Ex. E at AGA000053, AGA000775, Def.'s Ex. P, Faber Dep. at 18:3-17.) [4] When the AGA chose Latitude to do the transportation, AGA was still awaiting receipt of a completed AAMED form. (See Def.'s Ex. E at AGA00053-54.)

AGA's case notes indicate that at approximately 7:27 p.m., AGA employee Andrew Dozier spoke by telephone with Ms. Iversen and her friend Jeff Rottler. (Pl.'s Ex. 7, Dozier Dep.

---

[4]Latitude's call center and employees were located in Ontario, Canada, and the plane it was sending to get Dr. Tyler was based in the United States. (*See* Cimone Dep. at 71:25-72:14.)

17:11 – 26:18.) AGA's records of that conversation indicate that Dozier told them that an air ambulance would be provided sometime the next morning and that, among other matters, they discussed the urgency and importance of the AAMED form. The notes of that conversation indicate that Ms. Iversen or Rottler told Dozier they would "work on it in the meantime." (Def.'s Ex. E at AGA00054-55.)

At 10:08 p.m., AGA sent another AAMED form to Ms. Iversen, this time by emailing it to Rottler. (Def.'s Ex. O, Deyo Dep. at 34:24 – 35:3.) Ms. Iversen says this transmission was the first time that AGA sent the AAMED form to her.

After Ms. Iversen received the form via email, she completed it and promptly returned it by email to AGA. AGA received the completed AAMED form at approximately 10:45 p.m. AGA then provided the information to Latitude and assumed that Latitude would find a hospital for Dr. Tyler. (Def.'s Ex. B, Deyo Aff. at ¶ 25.)

In the early morning hours of January 3, 2013, AGA learned that Latitude had not been able to confirm a hospital for Dr. Tyler in south Florida, ostensibly because Dr. Tyler's medical insurance was a Rocky Mountain HMO plan that the south Florida hospitals would not accept. (Def.'s Ex. B, Deyo aff. at ¶ 26.)[5]

AGA then began working with Latitude to find a receiving hospital.

Ms. Iversen spoke with AGA early in the morning on January 3, and learned that AGA had not been able to confirm a hospital bed for Dr. Tyler in south Florida. Upset by that news, Ms. Iversen hung up and called a friend in Austin, Texas. Ms. Iversen testified that within

---

[5]Noreen Deyo, AGA's director of assistance, testified that this was "the only time where a U.S. health insurance, Medicare-specific insurance, could not be confirmed or accepted by the hospitals in Florida." (Def.'s Ex. O, Deyo Dep. at 43:17-20.)

approximately 10 minutes her friend had found an Austin hospital with a bed available for Dr. Tyler. Ms. Iversen then called AGA and conveyed that information. (Pl.'s Ex. 5, Iversen Dep. at 213:1-22.)

In response to Ms. Iversen's requests, AGA and Latitude began searching for receiving hospitals in Texas and Colorado for Dr. Tyler. (Def.'s Ex. B, Deyo Aff. at ¶ 28; Def.'s Ex. O; Deyo Dep. at 43:20-22.)

According to the Defendant, Latitude was not able to confirm that the South Austin Hospital would accept Dr. Tyler. (Def.'s Ex. B, Deyo Aff. at ¶ 27.)

By mid-afternoon on January 3, 2015, AGA was able to secure acceptance of Dr. Tyler as a patient at the University of Colorado Hospital in Aurora, Colorado. By that time, Dr. Tyler had died. The time of death was approximately 3:00 p.m. (Eastern Standard time) on January 3, 2013.

The U.S. Department of State report of Dr. Tyler's death states that he died of respiratory failure, kidney failure and hypovolemia. (Def.'s Ex. F.)[6]

The Plaintiff contends that the Defendant breached its obligation under the Policy by failing to identify the "closest appropriate facility" and failing to timely arrange a medical evacuation to such facility. The Plaintiff points out that there are hospitals in Texas that are geographically closer to San Miguel de Allende than the distance between that city and south Florida. The Plaintiff contends that a medical evacuation to a hospital in Texas could have been

---

[6]"Hypovolemia" means "decrease in the volume of the circulating blood." http://www.merriam-webster.com/medical/hypovolemia

effected more expeditiously, and if that had occurred, Dr. Tyler would not have died on January 3, 2013.

To support its contention about medical causation, the Plaintiff relies on the opinion testimony of Loren G. Lipson, M.D. ("Dr. Lipson").

The Defendant has moved to exclude the opinions and report of Dr. Lipson, based, in part, on a challenge to his credentials. It is not necessary to make a ruling on that because his conclusions as to causation in his report and in his deposition testimony are not of any probative value because they are based on unwarranted assumptions and an inadequate appraisal of information that was available.

Neither Dr. Lipson nor anyone else can give an opinion about the cause of Dr. Tyler's death without medical records showing the objective signs of his condition upon entering the Mexican hospital, what objective tests were made and what treatment was provided during his stay there.

Dr. Lipson reviewed medical records regarding Dr. Tyler and gave this summary:

> 11. Dr. Tyler has a medical history that includes: Stage V chronic kidney disease; a living unrelated kidney transplant; ulcerative colitis, history of carotid pseudo aneurysm and carotid jugular fistula; recurrent episodes of acute chronic renal failure requiring dialysis, with the last occurring in March of 2011; Gilbert Syndrome; hypertension; hyperlipidemia; gout; lead toxicity; surgical history of colectomy, inguinal hernia repair, shoulder repairs, Nissen procedure, and removal of skin lesion, allergies; postprandial hypoglycemia; GI bleed in 2008; recurrent muscle aches and weakness; decreased nocturnal oxygen saturation; gastroesophageal reflux disease; and a cerebral vascular accident in 2010.

(Lipson report, doc. # 66-1.)

He then gave these statements of his understanding of Dr. Tyler's condition and need for treatment:

> 13. Beginning on December 31, 2012, Dr. Tyler was in the care of Doctor Bortoni at Hospital de la Fe in San Miguel de Allende, Mexico as a result of gastrointestinal problems he was experiencing. Dr. Tyler began to feel better and regain lucidity from the severe gastrointestinal problems on January 1, 2013, but his condition deteriorated the following day. On January 3, 2013, Dr. Tyler passed.
>
> 14. Dr. Tyler was suffering from gastro-intestinal distress and resultant dehydration, which was causing renal insufficiency and placing his transplanted kidney at risk. Most U.S. hospitals that are tertiary or quaternary care facilities would have been able to minimize damage to Dr. Tyler and mitigate health problems if he had been transported in a timely fashion.

(*Id.*) His professional opinion is stated in this paragraph:

> 16. In my opinion, based on my review of the information noted above and my specialized knowledge, skills and training in health, that to a reasonable degree of medical certainty, had Dr. Tyler been transferred sooner to the United States, to [sic] tertiary or quaternary hospital in close proximity, he would have recovered from the acute gastro-intestinal insult he was suffering from, and would have minimized kidney damage and would not have died when he did.

(*Id.*)

What discredits this opinion is the assumption that all that was happening to Dr. Tyler was the result of gastrointestinal problems.

The information reportedly given to AGA by the attending physician Dr. Barrera was that the patient had suffered a stroke and had a clot in his brain. According to the reported telephone conversation with Ms. Hallock, she heard Ms. Iversen say that the problem may have been neurological.

It is notable that Dr. Lipson referred to a "tertiary or quaternary hospital" which recognizes the need for resources not available in all hospitals in the United States.

Dr. Lipson's report and testimony do not provide support for a finding that if the Defendant had transported Dr. Tyler to a hospital in Texas during the night of January 2, he

would have recovered from the unknown condition which afflicted him in the Mexican hospital at that time.

When Dr. Lipson was deposed, AGA's counsel asked him what a U.S. tertiary or quaternary facility would do differently to treat a patient with Dr. Tyler's same condition, and Dr. Lipson responded as follows:

> A    Well, I don't know what they did here. Okay? I mean– but what should have been done is to get him over to a facility.
>     They immediately – they scan his head. They look over about a stroke. They do a CAT scan of his chest to look for pneumonia.
>     You get all the blood work. You get him on antibiotics. You put him on hemodialysis immediately. You look at the possibility of the kidney.
>     You check to see if you can find a source of infection. And you give him his anti-rejection stuff. You give him steroids. And you sort of balance things.
>     And he would have to be in a ICU-type situation with, basically, a pulmonary intensivist giving his blood gases and nephrologist and gastroenterologist and a neurologist.
>     But he needed a full court press. And it's possible that if he got in there early enough, that by dialyzing him, giving him anti-rejection medication, giving him more steroids, making sure there was adequate fluids, he might not have lost the kidney.
>     But instead, he lost everything.
>
> Q    Okay. So I want to focus on the things you say a U.S. tertiary or quaternary facility could have done and should have done. All right?
>
> A    Yeah.
>
> Q    Okay. Do we know whether Hospital de la Fe attempted any of those things based on the records we have?
>
> A    No.

(Lipson Dep. at 188:24-190:6, doc. #66-10.)

That is an admission that eliminates any probative value to his opinion.

Based on the foregoing, it is

ORDERED that the Defendant's motion for summary judgment [doc. #65] is granted.

-14-

The clerk shall enter a final judgment dismissing all of the Plaintiff's claims and this civil action with an award of Defendant's costs.

Dated: February 17, 2016

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior Judge